# Authority to Employ White House Officials Exempt from Annual and Sick Leave Act During Appropriations Lapse

White House officials who are exempt from the Annual and Sick Leave Act pursuant to 5 U.S.C. § 6301(2)(x) and (xi) may continue to work during a lapse in the appropriations for their salaries.

April 8, 2011

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

You have asked whether White House Office officials who are exempt from the provisions of the Annual and Sick Leave Act under 5 U.S.C. § 6301(2)(x) and (xi) may continue to work during a lapse in appropriations. For the reasons set forth below, we conclude that they may.

## I.

In September 1995, this Office issued an opinion regarding "the authority available to the White House [O]ffice to employ the services of White House employees during a lapse in appropriations." *Authority to Employ the Services of White House Office Employees During an Appropriations Lapse*, 19 Op. O.L.C. 235 (1995) ("*White House Employees*"). As we explained there, two provisions of the Antideficiency Act impose the principal statutory constraints on this authority. Section 1341 of title 31 provides that "[a]n officer or employee of the United States Government . . . may not . . . involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(B). And section 1342 of the same title provides that "[a]n officer or employee of the United States Government . . . may not accept voluntary services for [the] government or employ personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property."

Applying these provisions to the White House Office, we identified three categories of employees who could continue to work during an appropriations lapse: "personnel who perform functions that are excepted from the Antideficiency Act's general prohibition" set forth in 31 U.S.C. § 1341; personnel who hold nonsalaried positions and whose employment

therefore does not "incur an obligation on behalf of the federal government"; and personnel who hold positions in which compensation is not fixed by law and who have lawfully waived their salaries. *White House Employees*, 19 Op. O.L.C. at 235–37. We explained that the "excepted functions" in the first category included "functions relating to emergencies involving an imminent threat to the safety of human life or protection of property"—an exception set forth in the Antideficiency Act itself, *see* 31 U.S.C. § 1342—and functions "authoriz[ed] . . . by other law," including "those functions as to which express statutory authority to incur obligations in advance of appropriations has been granted; those functions for which such authority arises by necessary implication; and certain functions necessary to the discharge of the President's constitutional duties and powers." *White House Employees*, 19 Op. O.L.C. at 235.[1]

Later that same year, we issued an opinion concerning the participation of Department of Justice officials in congressional hearings held during an appropriations lapse. That opinion contained further analysis potentially relevant to White House Office operations during such a time. We noted that "those officers who are appointed by the President with the advice and consent of the Senate"—so-called "PAS officers"—are "entitled to their salaries by virtue of the office that they hold and without regard to whether they perform any services during the period of appropriations lapse." *Participation in Congressional Hearings During an Appropriations Lapse*, 19 Op. O.L.C. 301, 301–02 (1995) ("*Congressional Hearings*") (citing *United States v. Grant*, 237 F.2d 511 (7th Cir. 1956)). We thus concluded that the Antideficiency Act was "not implicated at all" by such officers' activities, because "no federal officer or employee incurs an obligation in advance of appropriations when these officers perform services; instead, this obligation arises by virtue of their status and cannot be obviated by placing them on furlough status." *Id.*

You have asked whether, in light of these opinions, White House officials who are exempt from the Annual and Sick Leave Act pursuant to

---

[1] We also emphasized that even if salary funds could sometimes be obligated, "no salaries c[ould] be paid to any government employee, including those in the White House [O]ffice, without an appropriation," and thus that "no White House employee could receive salary or other compensation payments during such a lapse." *White House Employees*, 19 Op. O.L.C. at 235; *see also* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.").

5 U.S.C. § 6301(2)(x) and (xi) may continue to work during a lapse in the appropriations for their salaries. Although such officials are not specifically mentioned in the *White House Employees* opinion and are not appointed with the advice and consent of the Senate, you explain that, in your view, such persons are (like PAS officers) "entitled to compensation based on their status." E-mail for Caroline D. Krass, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from Donald B. Verrilli, Deputy Counsel to the President (Mar. 12, 2011) (citing 5 U.S.C. § 5508 and *Grant*, 237 F.2d 511). As a result, you conclude, "the government is 'authorized by law' within the meaning of 31 U.S.C. 1341" to "continue to . . . emplo[y]" such persons "in the absence of appropriations." *Id*. We agree: In our view, such officials are entitled to compensation based on their status rather than the hours they work, and the government is authorized by law to allow them to continue to work during a lapse in appropriations.

## II.

The Annual and Sick Leave Act of 1951, codified as amended at 5 U.S.C. §§ 6301–6391 (2006 & Supp. III 2009) (the "Leave Act"), sets forth the terms under which federal government employees earn annual and sick leave. Section 6301 defines "employee" for purposes of the Leave Act, and specifically excludes from its coverage certain categories of persons. As relevant here, section 6301(2)(x) excludes from the Leave Act "officer[s] in the executive branch . . . who [are] appointed by the President and whose rate of basic pay exceeds the highest rate payable under [the GS schedule]," and section 6301(2)(xi) excludes from the Act "officer[s] in the executive branch . . . who [are] designated by the President, except a postmaster, United States attorney, or United States marshal." 5 U.S.C. § 6301(2)(x), (xi). White House officials who fall within either of these paragraphs are not covered by the Leave Act.[2]

Section 5508 of title 5, which works in harmony with section 6301, provides that "officer[s] in the executive branch . . . to whom [the Leave

---

[2] We assume for the purposes of this opinion that there are White House officials who are in fact covered by these paragraphs. We have not independently analyzed whether particular officials are so covered and express no view about the scope of 5 U.S.C. § 6301(2)(x) and (xi).

Act] applies are not entitled to the pay of their offices solely because of their status as officers." This provision does not expressly address the entitlements of officials to whom the Leave Act does not apply. But by providing that officers who are covered by the Act do not earn pay by virtue of their status, it suggests by negative implication that officers who are exempt from the Act—including those exempt under 5 U.S.C. § 6301(2)(x) or (xi)—do earn their salaries by virtue of their status. *See* 61 Comp. Gen. 586, 587 (1982) ("The importance of that section for our purposes is that . . . the converse, that officers who are not so covered *are* entitled to compensation solely because of their status as officers, is also true."); *cf. Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 95 (1973) (supporting the conclusion that Title VII "was clearly intended to apply with respect to the employment of aliens inside any State" with "a negative inference from the exemption in § 702, which provides that Tit[le] VII 'shall not apply to an employer with respect to the employment of aliens outside any State'" (quoting 42 U.S.C. § 2000e-1)). This implication gains force from the fact that, as far as we are aware, no other provision in the Leave Act or title 5 addresses in terms the categories of officials who are entitled to salaries based on their status. Instead, section 5508 appears to be the only provision that discusses this subject.

Furthermore, the statutory text now found in section 5508 and section 6301(2)(x) and (xi) was enacted against a well-established "background of common-law principles," *Samantar v. Yousuf*, 130 S. Ct. 2278, 2290 n.13 (2010) (internal quotation marks omitted), governing officer pay. Prior to 1953, when these provisions were first enacted, it had long been the rule that "the right to the compensation attached to a public office is an incident to the title to the office and not to the exercise of the functions of the office." 24 Comp. Gen. 45, 46 (1944); *see also Grant*, 237 F.2d at 515 ("Congress in 1953 . . . recognized that prior thereto various officers, including United States marshals, were entitled to receive their salaries as incident to their respective offices."); *Pack v. United States*, 41 Ct. Cl. 414, 429 (1906) ("[T]he compensation annexed to a public office is incident to the title to the office and not to the exercise of the functions of such office."); *Sleigh v. United States*, 9 Ct. Cl. 369, 375 (1873) ("The incumbent of an office is *prima facie* entitled to the lawful compensation thereof so long as he holds the office, though he may be disabled by disease or bodily injury from performing its duties."); 46 C.J., *Officers*

§ 233, at 1015–16 & nn.29–31 (1928) (collecting cases). A federal officer received his salary for as long as he held title to his office, and "the failure of an officer to perform the duties of his office d[id] not *per se* deprive him of the right to compensation, provided his conduct d[id] not amount to an abandonment of the office." 24 Comp. Gen. at 46; *see also* 23 Comp. Treas. 383, 385 (1917). This rule operated even where these officers were covered by a federal leave system, and even where the leave laws enabled them to receive a lump-sum payment covering accumulated leave. *See* 25 Comp. Gen. 212, 220 (1945) (advising that "Presidential Officers" whose "salaries can not [sic] be reduced if they are absent from duty" may receive "lump-sum payment for accumulated and accrued annual leave") (citing 24 Comp. Gen. 804 (1945)); S. Rep. No. 83-294, at 2 (1953) (noting the "double advantage of these officers to statutory leave benefits and freedom to absent themselves from duty as they see fit").

In 1953, Congress amended the Leave Act in two significant respects. First, through the provisions subsequently codified at section 6301(2)(x) and (xi), it removed from the coverage of the Act certain "officers in the executive branch of the Government," including presidential appointees paid above the highest GS level and "such other officers (except postmasters, United States attorneys, and United States marshals) as may be designated by the President." Pub. L. No. 83-102, § 1, 67 Stat. 136 (1953). Second, in the provision codified at section 5508, it directed that "[n]o officer in the executive branch of the Government . . . to whom [the Leave Act] applies shall be deemed to be entitled to the compensation attached to his office solely by virtue of his status as an officer." *Id.* Through these amendments, Congress "intended to and did effect a change in the law" governing officers' entitlement to compensation, *Grant*, 237 F.2d at 515, but this deviation from the background common-law rule was limited to those officers still covered by the Leave Act. Because section 5508 does not purport to alter the law for officers exempt from the Leave Act, we "interpret the statute with the presumption that Congress intended to retain the substance of the common law," which in this case provided that officers are entitled to compensation by virtue of holding office. *Samantar*, 130 S. Ct. at 2290 n.13; *see also Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention

of long-established and familiar principles, except when a statutory purpose to the contrary is evident.").

This interpretation of sections 5508 and 6301 is supported by their legislative history. The committee reports explain that the addition of section 6301(2)(x) and (xi) was intended to eliminate the covered officers' "advantage . . . in being eligible to receive the benefits of a statutory leave system and, at the same time, being exempted, in effect, from the obligations of such leave system to the extent that by the nature of their offices and positions they have freedom to absent themselves from duty from time to time." H.R. Rep. No. 83-629, at 7 (1953) (Conf. Rep.); S. Rep. No. 83-294, at 1–2. Significantly, Congress achieved this end not by abrogating the common-law rule entitling such officers to pay by virtue of their status, but rather by withdrawing those officers' entitlement to benefits under the statutory leave system, leaving the background rule intact. And while the addition of section 5508 expressly addressed only those officers who do not earn salary based solely on their status (i.e., those still covered by the Leave Act under section 6301), the reports explain that this provision was also intended to "settl[e] the basic question of which officers shall be entitled in the future to the compensation attached to their office by virtue of their status as an officer." S. Rep. No. 83-294, at 1–2. Thereafter, "[o]fficers removed from . . . Leave Act coverage would be regarded as being entitled to the compensation of their offices by virtue of their officer status." *Id.* at 3; H.R. Rep. No. 83-629, at 7 ("[O]fficers exempted from the Annual and Sick Leave Act of 1951 will retain their freedom to absent themselves from duty on their own volition[.]"). We accordingly conclude that Executive Branch officials (including those in the White House) exempt from the Leave Act under section 6301(2)(x) and (xi) earn their salaries by virtue of holding office.

## III.

We further conclude that officials who are exempt from the Leave Act and therefore earn salaries by virtue of holding office are "authorized by law" to continue to work during a lapse in the appropriations for their salaries. 31 U.S.C. § 1341(a)(1)(B).[3] As noted above, our 1995 *White*

---

[3] We assume that such officials receive no other form of compensation whose continuation during an appropriations lapse would incur any additional government obligation.

*House Employees* opinion concluded that the functions "authorized by law" to proceed during an appropriations lapse include "those functions as to which express statutory authority to incur obligations in advance of appropriations has been granted," and "those functions for which such authority arises by necessary implication." 19 Op. O.L.C. at 235. In discussing the same categories of functions in an earlier opinion, Attorney General Civiletti explained that when "an agency's regular one-year appropriations lapse, the 'authorized by law' exception to the Antideficiency Act would permit the agency to continue the obligation of funds to the extent that such obligations are," among other things, "[1] authorized by statutes that expressly permit obligations in advance of appropriations; or [2] authorized by necessary implication from the specific terms of duties that have been imposed on, or of authorities that have been invested in, the agency." *Authority for the Continuance of Government Functions During a Temporary Lapse in Appropriations*, 5 Op. O.L.C. 1, 5 (1981) ("*Continuance of Government Functions*").

We are not aware of any law that "expressly permit[s] obligations in advance of appropriations" for salaries paid to White House Office officials who are not subject to the Leave Act. *Id.* However, we believe the authority to continue the obligation for these officials' salaries during a lapse in appropriations arises "by necessary implication from the specific terms of" the President's authority to appoint or designate officials who earn pay by virtue of their status. *Id.* We understand that "most White House [O]ffice employees are appointed under [section 105 of title 3] or a similarly formulated authority." *White House Employees*, 19 Op. O.L.C. at 236. That provision grants the President authority to "appoint and fix the pay of employees in the White House Office without regard to any other provision of law regulating the employment or compensation of persons in the Government service," subject to salary caps that are higher than the top of the GS scale. 3 U.S.C. § 105(a).[4] On its face, this provision

---

[4] We do not believe this authorization is sufficiently clear to constitute the kind of "express[] permi[ssion]" to obligate in advance of appropriations we identified in our 1981 opinion. *Continuance of Government Functions*, 5 Op. O.L.C. at 3–4 & n.3. Unlike section 105, other statutes we have previously included in that category expressly reference the authority to incur obligations in advance of appropriations. *See, e.g.*, 25 U.S.C. § 99 (authorizing the Commissioner of Indian Affairs to "enter into contracts . . . for goods and supplies . . . notwithstanding the fact that the appropriations for such fiscal

confers on the President authority to "appoint" persons to work in the White House Office and to fix their "rate of basic pay" at a rate that "exceeds the highest rate payable" under the GS scale. *See* Memorandum for Bernard Nussbaum, Counsel to the President, from Daniel L. Koffsky, Acting Assistant Attorney General, Office of Legal Counsel, *Presidential Authority under 3 U.S.C. § 105(a) to Grant Retroactive Pay Increases to Staff Members of the White House Office* at 2 (July 30, 1993) ("We believe that, in view of this sweeping language, section 105(a)(1) allows the President complete discretion to adjust the pay for White House Office employees' work in any manner that he chooses, as long as he complies with the salary limits of section 105(a)(2)."). Officers so appointed fall within section 6301(2)(x) of the Leave Act and (as a result) earn salary by virtue of their status under section 5508.[5] Section 6301(2)(xi) likewise recognizes the President's authority to "designate" other Executive Branch officers (except postmasters, U.S. attorneys, or U.S. marshals) as exempt from the Leave Act, again ensuring that they earn salary based on their status.

We think the "specific terms" of these presidential authorities "necessar[ily] impl[y]" the further authority to continue to incur obligations for

---

year have not been made"); *see also* 42 U.S.C. § 2210(j) (authorizing the Atomic Energy Commission to "make contracts in advance of appropriations and incur obligations without regard to sections 1341 [and] 1342 . . . of title 31"). Furthermore, we do not read the permission in section 105 to make appointments "without regard to any other provision of law regulating the employment or compensation of [federal employees]" to mean that such actions are outside the purview of the Antideficiency Act altogether. *Cf. Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1054 (D.C. Cir. 1987) ("We believe the plain meaning of the exemption codified in 42 U.S.C. § 1320c-2(e) [authorizing the Secretary to contract 'without regard to any provision of law relating to the making, performance, amendment, or modification of contracts'] is to exempt HHS from those laws 'relating to the making, performance, amendment or modification of contracts'—that is, the vast corpus of laws establishing rules regarding the procurement of contracts from the government. To include among this rather self-contained corpus the general restraints of the Administrative Procedure Act is a step we decline to make without more specific evidence that Congress intended to exempt HHS from the requirements of the APA." (citation omitted)).

[5] You have not asked us to consider whether section 105 gives the President authority to exempt White House personnel from the Leave Act even if they do not fall within any of the exemptions listed in section 6301, and we express no view about that question, or about the question whether any such personnel would be "authorized by law" to perform service during a lapse in appropriations.

the salaries of such exempted officers in the absence of appropriations. *Continuance of Government Functions*, 5 Op. O.L.C. at 5. As discussed above, officials who fall within section 6301(2)(x) or (xi) are, by virtue of section 5508, "entitled to the pay of their offices solely because of their status as officers." 5 U.S.C. § 5508. Such an entitlement to salary, and the corresponding government obligation to fulfill it, is unaffected by the official's absence from the duties of his office. *Grant*, 237 F.2d at 515 (holding that the salary of an officer so entitled "belonged to him as an incident to his office and was in no way impaired by his alleged absence therefrom or neglect to perform his official duties"); *see also* 24 Comp. Gen. 45, 46 (1944). As we noted in our *Congressional Hearings* opinion, this means that the government cannot avoid this obligation during a lapse in appropriations simply by placing the official on furlough status. 19 Op. O.L.C. at 302.

Given the President's clear statutory authority to appoint and designate officials with these kinds of broad salary entitlements, *see* 3 U.S.C. § 105(a)(1); 5 U.S.C. §§ 5508, 6301, and given the Antideficiency Act's express exceptions for obligations exceeding appropriations where "authorized by law," *see* 31 U.S.C. §§ 1341, 1342, we think the best way to reconcile the two statutory schemes is to interpret sections 5508 and 6301 of the Leave Act and section 105 of title 3 as implicitly "authoriz[ing]" the President "by law" to incur such salary obligations in advance of appropriations. *Cf. Continuance of Government Functions*, 5 Op. O.L.C. at 4 ("[W]hen Congress specifically authorizes contracts to be entered into for the accomplishment of a particular purpose, the delegated officer may negotiate such contracts even before Congress appropriates all the funds necessary for their fulfillment.").[6] If the President's statutory authority to appoint and designate officials who earn salaries by virtue of their status did not implicitly include the authority to obligate funds for those salaries in advance of appropriations, compliance with the Antideficiency Act would arguably require him to appoint such officials to terms limited to the fiscal year (so as to avoid incurring an indefinite obligation

---

[6] As we understand it, your question concerns only officials who currently work in the White House Office. You have not asked us to consider, and we express no opinion about, whether the President could, during an appropriations lapse, appoint or designate new officials who are exempt from the Leave Act and therefore entitled to earn salary by virtue of their status.

that potentially exceeded the current year's appropriations), to remove such officials during any lapse in appropriations or require them to resign, or otherwise to find a way to avoid involving the government in an obligation that exceeded available appropriations. *See* 31 U.S.C. §§ 1341, 1342.[7] But there is no indication in sections 5508 or 6301 of the Leave Act or section 105 of title 3 that, in authorizing the President to create broad salary obligations for officers who earn pay by virtue of their status, Congress simultaneously intended to limit the President's appointment authority in any of the ways described above. Nor are we aware of any evidence that the Executive has imposed such restrictions as a matter of practice.

This conclusion is consistent with that reached by the Comptroller General in an opinion concerning whether Commissioners of the Copyright Royalty Tribunal could be paid for work performed during a lapse in the Tribunal's appropriations. 61 Comp. Gen. 586 (1982). In that opinion, the Comptroller General reasoned that the Commissioners were exempt from the Leave Act under section 6301(2)(xiii)—a provision similar to section 6301(2)(x) and (xi) but directed at presidentially appointed "officer[s] in the legislative or judicial branch"—and were therefore "entitled to compensation based on their status as officers rather than for the performance of a function based on the amount of hours they spend engaged at their jobs." *Id.* at 587. The Comptroller General then concluded that, in light of this entitlement, "the incurring of obligations for the Commissioners' pay in the absence of sufficient available appropriations to liquidate them is authorized by law within the meaning of the [*Continuance of Government Functions* opinion]." *Id.*

Given that the President is "authorized by law" to continue the obligation for the salaries of officials exempt from the Leave Act under section 6301(2)(x) or (xi) during a lapse in appropriations, the final question whether such officials can continue to work during a lapse is straightforward. As we noted in our *Congressional Hearings* opinion with respect to PAS officers, because such officials "are entitled to their salaries by virtue

---

[7] Incurring an obligation to pay any particular official's salary, of course, might be justified for particular periods based on other exceptions to the Antideficiency Act. *See* Memorandum for Alice Rivlin, Director, Office of Management and Budget, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Government Operations in the Event of a Lapse in Appropriations* at 3–4 (Aug. 16, 1995).

of the office[s] that they hold and without regard to whether they perform any services," no further obligation in advance or in excess of appropriations is incurred when they "perform services." 19 Op. O.L.C. at 301–02; *see* 31 U.S.C. §§ 1341, 1342. The funds for these officials' salaries having already been lawfully obligated, "the [Antideficiency] Act is not implicated at all" when they choose or are directed to continue to work during a lapse in appropriations. *Congressional Hearings*, 19 Op. O.L.C. at 301.

## IV.

To summarize, we concluded in our *White House Employees* opinion that, during a lapse in appropriations, the Antideficiency Act permits the White House to employ personnel who "perform functions that are excepted from the Antideficiency Act's general prohibition" because the obligation for their salaries during a lapse is "authorized by law." 19 Op. O.L.C. at 235. For the reasons set forth above, we now conclude that such personnel include officials who are exempt from the provisions of the Annual and Sick Leave Act under 5 U.S.C. § 6301(2)(x) and (xi), because the President's authority to appoint such officials necessarily implies the authority to continue the obligations for their salaries during a lapse in appropriations. Accordingly, such officials may work during a lapse in appropriations, so long as the employment of their services does not create any other obligation on behalf of the government.

KARL R. THOMPSON
*Deputy Assistant Attorney General*
*Office of Legal Counsel*